DECISION
In this zoning appeal, One Athenaeum Row Associates, LLC ("Appellant," or "Applicant") brings this appeal from a decision of the Zoning Board of Review of the City of Providence ("Zoning Board" or "Board" or "Appellees"). The Board denied its application for multiple variances seeking relief from the Providence Zoning Ordinance ("Ordinance"); namely, § 201.7 (prohibiting the intensification of nonconforming uses), § 304 table of dimensional regulations in residential districts (minimum side yard and rear yard dimensions, as well as maximum lot coverage), and § 704.2 (restriction on paving), required in order to construct a parking deck in the rear of its lot. Jurisdiction is pursuant to G.L. 1956 § 45-24-69.[1] *Page 2 
 I Facts and Travel
The Appellant owns property located at 257 Benefit Street in the City of Providence, and otherwise known as Lot 462 on the Tax Assessor's Plat 12. The property is one of five historic townhouses known as Athenaeum Row in the College Hill Historic District of Providence. The townhouse at 257 Benefit Street consists of four residential units. Athenaeum Row was constructed in 1854, before the invention of the automobile. While each of the five townhouses is located on a separate lot, the buildings themselves are separated by common party walls. No provision was made for parking on any of the properties. Athenaeum Row is located in a Residential "R-1" One-Family Zone.
The Appellant submitted a separate, but almost identical, application to that of two other properties that also are located in Athenaeum Row. The other properties are located at 259 and 261 Benefit Street, respectively. Essentially, the applications sought multiple variances so that each owner could construct a parking deck in the rear of each yard in order to accommodate three parking spaces for each building. In order to construct the deck, the applicants each required relief from the regulations governing the number of parking spaces, minimum side-yard and rear-yard dimensions, and paving coverage requirements of the Ordinance, as well as the Ordinance's prohibition on intensification of nonconforming uses.
On November 28, 2006, a duly noticed public hearing was conducted by the Board. The Appellant, and the owners of 259 and 261 Benefit Street, through their joint counsel, requested that all three matters be heard simultaneously. The Board agreed to the request after stipulating that any evidence introduced at the hearing be incorporated into each individual record.[2] *Page 3 
At the hearing, Appellant's attorney provided the Board with an overview of the desired deck structure and why the variances were needed. He introduced an aerial photograph of the site where the deck would be built (Applicant's Ex. A), and a copy of the plans for the deck. (Applicant's Ex. B.) He explained to the Board that the properties in Athenaeum Row have not had on-site parking since they were constructed in 1854. He advised the Board that the residents of the townhouses in Athenaeum Row historically had leased parking spaces from nearby Brown University ("Brown"), but that Brown had begun to insert provisions into its lease agreements permitting it to cancel the lease agreements at will, so long as it provides a year of notice to the leaseholders.
The first witness to testify was Mr. Scott Weymouth ("Weymouth"). Mr. Weymouth, a licensed architect practicing since 1983, was accepted as an expert by the Board. He told the Board that he designed the initial plans for the deck to complement the historic nature and main structure of the Athenaeum Row properties. (Hearing Transcript (Tr.), dated November 28, 2006, at 52.) He then described the deck in the following manner:
 The idea is that it will be an elevated concrete deck. It will be raised on columns with spread footings and steel beams, and then the exterior of the building facing Athenaeum Row would be a complimentary brick and pick up on the stone lintels in the building. So there is an attempt to, sort of, tie the aesthetics of the building to the parking deck. (Tr. at 54.)
Mr. Weymouth testified that the deck would be raised approximately twelve feet above the current grade, and each that property would accommodate three compact sparking spaces. *Page 4 
(Tr. 55-56.) The space underneath the deck, currently used as courtyards for each of the properties, would remain available to the owners as storage space and to hide air conditioning condensers. (Tr. 56.) Additionally, Mr. Weymouth noted that that space would be hidden from public view by the buildings themselves.
After Mr. Weymouth testified, Appellant's attorney introduced more exhibits. Among the exhibits introduced were letters between Appellant and the City of Providence inquiring into the feasibility of establishing dedicated on street parking (Applicant's Ex. G); the Providence Historic District Commission staff report recommending conceptual approval of the deck (Applicant's Ex. D); and letters to Brown University seeking to work out parking arrangements. (Applicant's Ex. E.) He also introduced a letter to the Board (Applicant's Ex. F), written by Dr. Michael and Nancy Band Ehrlich (the "Erhlichs"), the owners of one of the units at 259 Benefit Street. (Tr. 63.)
In the letter, the Erhlichs explain that the effects of their advancing age have made the lack of convenient parking more troublesome, such that it may force them to leave the city if they are unable to find a suitable solution. They stated that the deck would not be visible from a public way and that their view would not be changed because the current view beyond their property line is of the Brown-operated parking lot on which they have historically parked.
The Applicant then called Mr. Frank Scotti, one of the owners of 261 Benefit Street, ("Scotti") to testify.[3] Mr. Scotti presented the Board with a packet of photographs containing images of the conditions of the neighboring properties, as well as some of the typical parking situations around 261 Benefit Street. (Applicant's Ex. H.) Mr. Scotti testified that two days after *Page 5 
he closed on his purchase of 261 Benefit Street, he received a letter from Brown indicating that it would not lease parking to him. (Tr. 68.) The purported letter was not introduced into evidence. Mr. Scotti detailed a series of efforts to get Brown to agree to lease parking. (Tr. 68-69.) In addition, he testified that he unsuccessfully tried to secure a dedicated parking permit from the City of Providence. Id. Mr. Scotti also stated that in addition to asking for a lease, the partnership attempted to buy parking from Brown — to no avail. (Tr. at 114.)
Mr. Scotti further testified that he had no alternative to secure parking for 261 Athenaeum Row other than the deck plan that was pending before the Board. (Tr. 69.) He later stated that
 We have been working on this project for over a year. At this point we are kind of in limbo without the parking, and it's costing us about 10,000 bucks a month. Without parking I don't think we can sell the units without it. I think it's a real hardship for us if you deny it. (Tr. 121.)
The Appellant then called Mr. James Sloan ("Sloan"), a local real estate agent.[4] The Board recognized Mr. Sloan as an expert without objection. (Tr. 69-70.) Mr. Sloan testified that he was familiar with the property in question. (Tr. 70.) He further testified that he had considerable experience appraising properties in the City of Providence, including properties that do not have parking. (Tr. 72.) Mr. Sloan testified that the absence of parking on Providence's East Side was "very common," and that it wasn't unusual to find properties in this particular area with little or no parking. Id.
Mr. Sloan also testified that it was his expert opinion that the hardship suffered was due to the unique characteristics of the subject land due to the topographical layout of the property *Page 6 
and because of the dimensional attributes of the building, including shared common walls and large building footprints. (Tr. at 73.) Mr. Sloan expressed his opinion that the hardship was not the result of any physical or economic disability of the Applicant and was not the result of the Applicant's prior actions because row houses were a common form of construction at the time Athenaeum Row was built.Id. When asked whether the requested relief was based primarily on a desire of the Applicant to realize greater financial gain or on the necessity to provide parking, he opined that it was the necessity to provide parking. (Tr. 74.)
Mr. Sloan further testified that the granting of the requested variance would not alter the general character of the surrounding area because "basically, this is where parking has been for years."Id. He testified that in his expert opinion, granting the variances would not impair the intent or purpose of the Ordinance or the Comprehensive Plan. He further opined that the plan would not affect a diminution in the value of the surrounding properties because due to the limited rear yard area, it is the logical location to place parking. (Tr. 75.) Additionally, Mr. Sloan testified to his belief that the requested relief was the least relief necessary because it was "the least relief that would be afforded to have any kind of reasonable parking because there is just so much space to deal with." (Tr. 75.) Finally, Mr. Sloan testified that the Applicant would suffer a hardship amounting to more than a mere inconvenience if the relief were not granted because "there are very few properties that have absolutely no parking, and these would continue to be in that classification now that they no longer have the option of leasing space in the immediate vicinity." Id.
After Appellant presented its evidence, the Board heard from a series of people who opposed granting the variance (the "Objectors"). The first objector to testify was Mr. William Barnum ("Barnum"), a resident of 2 George Street and an abutter of Athenaeum Row to the *Page 7 
South. Mr. Barnum, an architect, testified that in his opinion the proposed project "strikes at the heart of what planning and zoning is all about, namely the preservation and protection of light and air." (Tr. 78.) He stated that currently, if one looks down from the gangway, one can see small landscaped courtyards and that the proposed project would eliminate that view, and would impinge on the light and air that makes the area attractive. (Tr. 79.)
Next to testify was Ms. Susan Nulman ("Nulman"), a resident of 265 Benefit Street, a property that is a part of Athenaeum Row. Ms. Nulman testified that, in her opinion, the previous testimony that the deck would not have an impact on the character of the neighborhood overlooked the fact that the deck would result in the removal of the "court yards as they are now, which is greenery, attractive shrubbery. . . ." (Tr. 79.) She also testified that the addition of cars would worsen the existing congestion for the cars that already park in the area. (Tr. 79-80.) Additionally, Ms. Nulman expressed concern that none of the Applicants actually has a current hardship because each has access to parking at Brown. (Tr. 80.)
Ms. Alice Miles ("Miles") next appeared before the Board. (Tr. 80.) Ms. Miles, another resident at 265 Benefit Street, testified that the land behind Athenaeum Row used to look "like an orchard back there." (Tr. 81.) She indicated that she understood the desire for parking and relayed to the Board how she had to purchase property around the corner on George Street in order to acquire parking for her unit. (Tr. 81.) She further expressed concerns that the Applicant currently does not need a variance because Brown had spaces available to lease. Id.
Next to testify was Mr. Ronald Dwight ("Dwight"), a Board member of the College Hill Neighborhood Association and a resident of 155 Benefit Street. (Tr. 82.) He indicated that his house had never had parking and that the houses at 153, 151, and 149 Benefit Street also lacked parking. (Tr. 83.) He testified that the neighborhood used to have access to the Watshire Garage *Page 8 
for parking, but when the Rhode Island School of Design purchased the garage, the residents of the neighborhood were no longer allowed to park there. (Tr. 83.) As a result, it had become commonplace for residents to purchase houses that came on the market with parking and then resell the house only, while retaining the parking. (Tr. 83-84.) Should the Board approve the variances, he indicated his intention to come before the Board to seek a similar one, and he predicted an "avalanche" of similar applications. (Tr. 84.)
Mr. Fred Stachura ("Stachura"), an attorney representing Mrs. Hope Goddard, a resident of 64 Angell Street, presented the Board with a copy of a letter from Ms. Goddard and emphasized a number of its points. (Tr. 84-87.) Mr. Stachura noted that Athenaeum Row was constructed in 1854 by Russell Warren and was developed by Thomas Poynton Ives, a member of a prominent Providence family. (Tr. 85.) He further elaborated on the history and architecture of Athenaeum Row, explaining that the building "follow[s] an English plan of row houses, and this type of row house is really unique to Providence, from a historic preservation point of view. There aren't any others like it built in this period in the state." Id.
Mr. Stachura noted that Athenaeum Row is located in the "Benefit Street mile of history" and explained that "the whole integrity of the building is reflected not only from the street façade, the Benefit Street Façade, but also from the rear." (Tr. 85-86.) He further testified "[i]f you actually walk up the hill, you have a clear view of the rear side of the Athenaeum as well as the Athenaeum block, and this is something that should be considered with respect to the parking decks, the steel frame parking decks, which we feel will do irreversible damage to the integrity of the historic building itself." (Tr. 86.) Mr. Stachura's testimony prompted the Board's chairman to inquire why the Historic District Commission approved the plan. Mr. Stachura responded by emphasizing that the Historic District Commission approval was only a *Page 9 
preliminary conceptual approval and that, in his opinion, the Commission failed to consider all of the relevant facts and reached an erroneous result. (Tr. 87.)
The next to testify was Mr. Jack Gold ("Gold"), Executive Director of the Providence Preservation Society. Mr. Gold, who has a Masters Degree in Preservation Planning from Cornell University and works as an Architectural Historian and Preservation Planner, testified that he agreed with Mr. Stachura's points regarding the historic nature of the property. (Tr. 88-89.) He stated that the "project will have a severely negative impact on the historic and architectural nature of this property at Athenaeum Row." (Tr. 89.) Mr. Gold also expressed concerns that the approval would add to the already "terribly dense" traffic, and that the area where the deck would be placed is "incredibly visible from a public way."Id. Finally, Mr. Gold testified that, in his opinion, the project would have a negative impact on the value of the surrounding properties. (Tr. 89-90.)
Mr. Richard Congdon ("Congdon"), a member of the Providence Athenaeum Board and Chairperson of its Buildings and Grounds Committee, also testified in opposition to the proposal. (Tr. 93.) Mr. Congdon related to the Board some of the Providence Athenaeum Board's issues related to water run off from Athenaeum Row, and he expressed concern that paving over more of the area behind Athenaeum Row could exacerbate said problems. (Tr. 94.) He asked that the variance be denied until the drainage and safety concerns could be addressed. (Tr. 94-96.)
Mr. Chris Tompkins, President of the College Hill Neighborhood Association, also testified. (Tr. 96.) He expressed concern that approval of the variance would establish a precedent that any R-1 zoned property would be able to pave over its back yard to add parking. Id. He also informed the Board that he had discussed the issue of the leases earlier that day with Mr. Michael Chapman, Brown University's Vice President of Public Affairs. (Tr. 97.) He said *Page 10 
Mr. Chapman had told him that all parking leases were being renewed and that Brown had rejected an attempt by the owners of 261 Benefit Street to purchase, as opposed to lease, parking spaces. (Tr. 97.)[5] He admitted that he did not have another source for that information, but that he felt a solution could be worked out that did not involve the issuance of the requested variances. (Tr. 97-98.)
At the conclusion of evidence, there was some discussion with regard to the parking leases with Brown. (Tr. 107-119.) Due to confidentiality clauses in the leases, the property owners were not able to discuss the terms in detail, but they did state that the leases may be canceled upon 365 days notice. (Tr. 108.) At one point, the Chairman of the Board offered to continue the matter so that a representative from Brown could appear before the Board to explain its position. (Tr. 120.) Counsel for the Applicant declined the invitation. Id. Thereafter, the Board voted three to two in favor of denying the request for dimensional relief. In a subsequent written decision, the Board set out its findings of fact and conclusions of law. See Resolution No. 9171, dated February 23, 2007.
The Appellant timely appealed the decision to this Court. Additional facts will be
provided as necessary to the resolution of this matter.
 II Standard of Review
Superior Court review of zoning board decisions is governed by § 45-24-69(d), which provides:
 The Court shall not substitute its judgment for that of the zoning board of review as to the weight of the evidence on questions of fact. The court may affirm the decision of the zoning board of review or remand the case for further proceedings, or may reverse or modify the decision if substantial rights of the appellant have *Page 11 
been prejudiced because of findings, inferences, conclusions, or decisions which are:
 (1) In violation of constitutional, statutory, or ordinance provisions;
 (2) In excess of the authority granted to the zoning board of review by statute or ordinance;
 (3) Made upon unlawful procedure;
 (4) Affected by other error of law;
 (5) Clearly erroneous in view of the reliable, probative, and substantial evidence of the whole record; or
 (6) Arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion.
"[T]he Superior Court reviews the decisions of a plan commission or board of review under the `traditional judicial review' standard applicable to administrative agency actions." Restivo v.Lynch, 707 A.2d 663, 665 (R.I. 1998). When reviewing a zoning board decision, the Superior Court "lacks [the] authority to weigh the evidence, to pass upon the credibility of witnesses, or to substitute [its] findings of fact for those made at the administrative level." Id. (quoting Lett v.Caromile, 510 A.2d 958, 960 (R.I. 1986)). Rather, the reviewing justice "must examine the entire record to determine whether `substantial' evidence exists to support the board's findings."DeStefano v. Zoning Bd. of Review of Warwick,122 R.I. 241, 245, 405 A.2d 1167, 1170 (1979).
"`Substantial evidence . . . means such relevant evidence that a reasonable mind might accept as adequate to support a conclusion and means [an] amount more than a scintilla but less than a preponderance.'" Lischio v. Zoning Bd. of Review of the Townof North Kingstown, 818 A.2d 685, 690 n. 5 (R.I. 2003) (quotingCaswell v. George Sherman Sand and Gravel Co., Inc.,424 A.2d 646, 647 (R.I. 1981)). In short, a reviewing court may not substitute its judgment for that of the board's if it "can conscientiously find that the board's decision was supported by substantial evidence in the whole record." Mill RealtyAssocs. v. Crowe, 841 A.2d 668, 672 *Page 12 
(R.I. 2004) (quoting Apostolou v. Genovesi,120 R.I. 501, 509, 388 A.2d 821, 825 (1978)). In contrast, when a question of law is presented, the Court conducts its review of that issue de novo. See Tanner v. Town Council,880 A.2d 784, 791 (R.I. 2005).
 III Law and Analysis
Under the Rhode Island Zoning Enabling Act of 1991, municipalities are directed to empower their zoning boards to vary the literal requirements of the zoning ordinance where enforcement of such requirements would work an undue hardship on a property owner.See § 45-24-41. Providence grants the Board this authority in Ordinance § 902.3, which provides that the Board shall have the power:
 To authorize, upon application, in specific cases of hardship, variances in the application of the terms of this zoning ordinance, as provided below:
 (A) In granting a variance, the board shall require that evidence to the satisfaction of the following standards be entered into the record of the proceedings:
 1. That the hardship from which the applicant seeks relief is due to the unique characteristics of the subject land or structure and not to the general characteristics of the surrounding area; and is not due to a physical or economic disability of the applicant;
 2. That the hardship is not the result of any prior action of the applicant and does not result primarily from the desire of the applicant to realize greater financial gain;
 3. That the granting of the requested variance will not alter the general character of the surrounding area or impair the intent or purpose of this ordinance or the Comprehensive Plan; and
 4. That the relief to be granted is the least relief necessary.
 (B) The board shall, in addition to the above standards, require that evidence be entered into the record of the proceedings showing that:
 1. In granting a use variance the subject land or structure cannot yield any beneficial use if it is required to conform to the provisions of this ordinance. Nonconforming use of neighboring land or structures in the same zone or district and permitted use of lands or structures in an adjacent zone or district shall not be considered in granting a use variance; and *Page 13 
 2. In granting a dimensional variance, that the hardship that will be suffered by the owner of the subject of property if the dimensional variance is not granted shall amount to more than a mere inconvenience, which shall mean that there is no other reasonable alternative to enjoy a legally permitted beneficial use of one's property.[6] The fact that a use may be more profitable or that a structure may be more valuable after the relief is granted shall not be grounds for relief.
 (C) In addition to the above, the board shall consider the written opinion of the department of planning and development prior to making a decision on a variance petition.
Here, in order to permissibly build its proposed deck, the Appellant applied to the Board for a series of variances. First, Appellant sought a variance from Ordinance § 304, side-yard requirements, which requires that the property have side yards of at least thirty percent of lot width, with no one side yard less than six feet. Currently, the property has zero side yards with respect to the main structure. The requested variance would allow the Applicant to retain the zero side yard with respect to the extended area to be occupied by the envisioned deck. Next, Appellant requested a variance from the § 304 rear-yard requirements, which require a rear-yard equivalent to twenty-five percent of the lot depth and which would be zero after construction of the deck. Additionally, Appellant sought a variance from the § 304 maximum lot coverage restriction of thirty-five percent, which the property already exceeds, which would be further *Page 14 
exceeded by the construction of the deck. The Appellant also sought a variance from § 704.2(c), restricting the amount of paving on any rear yard to no more than fifty percent of the rear yard area. Finally, the Appellant sought a variance from Ordinance § 201.7, prohibiting the intensification of nonconforming uses.
The Appellant raises two primary issues on appeal: first, Appellant contends that the decision was made upon unlawful procedure in that the Board failed to make sufficient findings of fact as required by § 45-24-61. Second, Appellant contends that the Board exceeded its authority in denying its requested dimensional variances because Appellant presented sufficient competent and uncontroverted expert evidence to establish its right to those variances, and that the Board's failure to grant the requested variances constituted an abuse of discretion. The Court will consider these issues in seriatim.
 A The Sufficiency of the Findings of Fact
Before considering the merits of the Appellant's argument with respect to the weight of the evidence, the Court must first address the question of the sufficiency of the Board's findings of fact and conclusions of law contained in the Board's written decision. The Appellant contends that the Board's decision fails to make the requisite findings of fact and conclusions of law. Specifically, Appellant points to the transcript of the Board's meeting, revealing only five pages worth of discussion after the evidence had been taken, as evidence that the Board failed in its duty to make findings of fact.
In response, the Board contends that its decision is sufficiently detailed in that it resolves the relevant questions of fact and draws appropriate conclusions of law. In particular, it asserts that the decision of the Board, in which it made in excess of fifteen paragraphs' worth of findings of fact and conclusions of law, was sufficient to satisfy its statutory obligations. *Page 15 
Rhode Island General Laws section 45-24-61 requires that "[t]he zoning board of review shall include in its decision all findings of fact. . . ." Furthermore, it is well established that "a zoning board of review is required to make findings of fact and conclusions of law in support of its decisions in order that such decisions may be susceptible of judicial review." Von Bernuth v. ZoningBoard of Review of New Shoreham, 770 A.2d 396, 401 (R.I. 2001) (quoting Cranston Print Works Co. v. City of Cranston,684 A.2d 689, 691 (R.I. 1996)); see also IrishPartnership v. Rommel, 518 A.2d 356, 358 (R.I. 1986);May-Day Realty Corp. v. Board of Appeals of Pawtucket,107 R.I. 235, 239, 267 A.2d 400, 403 (1970). Indeed, on multiple occasions, our Supreme Court has directed zoning boards
 to make certain that zoning-board decisions on variance applications (whether use or dimensional) address the evidence in the record before the board that either meets or fails to satisfy each of the legal preconditions for granting such relief, as set forth in § 45-24-41(c) and (d). Such a specification of evidence in the decision will greatly aid the Superior Court . . . in undertaking any requested review of these decisions. Sciacca v. Caruso, 769 A.2d 578, 585 (R.I. 2001).
In assessing the sufficiency of zoning board findings, this Court
 must decide whether the board members resolved the evidentiary conflicts, made the prerequisite factual determinations, and applied the proper legal principles. Those findings must, of course, be factual rather than conclusional, and the application of the legal principles must be something more than the recital of a litany. These are minimal requirements. Unless they are satisfied, a judicial review of a board's work is impossible. Irish Partnership, 518 A.2d at 358-59 (quoting May-Day Realty, 107 R.I. at 239, 267 A.2d at 403).
Furthermore, "when the board fails to state findings of fact, the court will not search the record for supporting evidence or decide for itself what is proper in the circumstances." IrishPartnership, 518 A.2d at 359. The Court concludes that in the instant matter, the findings that the Board set forth in its decision satisfy these minimum requirements. *Page 16 
In its decision, the Board found that the Applicant "currently rented parking spaces from Brown University. . . ." (Resolution No. 9171, at 3.) It further found that although the new parking leases "include a provision that would allow Brown to terminate with one year's notice . . . [the Applicant] has been continuing to use the parking spaces without interruption under the terms of the new lease for over 4 years." Id. The Board also found that
 [i]t was not clear through Applicant's testimony to the Board that the Applicant had any need for immediate relief or was suffering any immediate hardship given that the Applicant continues to rent parking spaces from Brown (as it has for a significant period of time — well prior to the present owner's purchase of the subject property) and has received no formal or informal notification from Brown that this arrangement has been or will be terminated. The Board offered to continue the matter so that a representative from Brown could be called upon to testify and provide a full picture of the parking relationship; however, the Applicant declined the Board's offer. Further there was no documentary evidence submitted by the Applicant setting forth the terms of said parking lease or the proposed changes by Brown. In addition, the Applicant did not proffer any testimony as to its ability to lease alternative parking spaces in the event that the existing spaces were no longer available. Id.
The Board then found that it
 was uncomfortable with the various representations being made regarding Brown without either a Brown representative present or any documentation to support said representations. The Board was further concerned with the Applicant's unwillingness to continue the matter so that Brown could have a representative present. Id.
Thereafter, the Board concluded that the Applicant had failed to meet its burden of proof with respect to the existence of a hardship:
 [T]he Applicant has not clearly demonstrated that any hardship exists and, in fact, proffered testimony that it has continued to lease and use the parking spaces without interruption or interference for over 4 years since the expiration of said 20-year lease; consequently, the Board believes that this matter does not properly belong before it at this time. Id. *Page 17 
The Board continued:
 Further, while the Applicant has shown that the supposed hardship is not due to a physical or economic disability of the Applicant, it has not clearly shown that said hardship is due solely to the unique characteristics of the subject property and not due to the general characteristics of the surrounding neighborhood especially given the age and development history of [B]enefit [S]treet, College Hill and this particular property (pre-automobile) and the fact that the subject property has been in continuous residential use without on-site parking for approximately 150 years.
 In addition, the Applicant has not clearly shown that said proposed hardship is not the result of any prior action of the Applicant given the concern that a hardship may not even exist for the Applicant. The Applicant also testified that its request for relief does not result primarily from the desire of the Applicant to realize greater financial gain; however, the Board notes that a deeded parking space is much more valuable to an owner (and prospective purchaser) than a leased parking space that may, at some time in the future, need to be renegotiated and that Applicant's counsel has indicated, at a minimum, has too short a term. Id.
The Board specifically found that the Applicant "did not present any testimony that said prospective hardship that will be suffered by the Applicant if the relief requested is not granted shall amount to more than a mere inconvenience." Id. at 4. The Board also found that the Applicant had failed to satisfy its obligation to show that the relief requested was the least relief necessary for the hardship to be alleviated and, specifically, the Board found that the Applicant "did not testify to any other attempts to satisfy the parking requirements." Id. The Board also found that given the age and development history of Benefit Street itself, that the Applicant did not clearly show that any hardship was due solely to unique characteristics of the property rather than due to general characteristics of the neighborhood. Id. Indeed, it questioned whether there existed a hardship in the first place since the record demonstrated that the Applicant still leased parking from Brown.Id. *Page 18 
After careful review of the decision issued by the Board on the Appellant's request for zoning relief, the Court is satisfied that these findings of fact provide the Court with the necessary means to review the Board's decision. See Von Bernuth,770 A.2d at 401 (stating that "a zoning board of review is required to make findings of fact and conclusions of law in support of its decisions in order that such decisions may be susceptible of judicial review").
 B The Variances
Turning then to the question of whether the Board's decision was supported by substantial record evidence, the Appellant contends that the Board exceeded its authority in denying its requested dimensional variances because it presented sufficient competent and uncontroverted expert evidence to establish its right to the requested dimensional variances. Thus, the Appellant maintains that the Board's failure to grant the requested variances constituted an abuse of discretion. The Appellant further contends that with respect to the question of hardship suffered, it demonstrated that the Board's denial of the requested relief, would amount to "more than a mere inconvenience."
In response, the Board contends that its decision was supported by the record evidence considered as a whole, and that the Appellant failed to meet its burden in establishing entitlement to the requested zoning relief. It further asserts that it was free to credit the testimony of the expert, Mr. Sloan, as it saw fit, and was free to conclude that the Appellant had failed to satisfy its burden of proving that it was suffering a hardship that was more than a mere inconvenience.
A zoning board may accept or reject expert testimony, but where it rejects the testimony, it must on the basis of clear and competent evidence in the record. See Restivo,707 A.2d at 671 (observing that "there is no talismanic significance to expert testimony. It may be accepted or *Page 19 
rejected by the trier of fact . . . particularly when there is persuasive lay testimony" in the record). However, "[a]n expert may not give an opinion without describing the foundation on which his opinion rests." Nasco, Inc. v. Director of Public Works,116 R.I. 712, 712, 360 A.2d 871 (1976). Furthermore, "[i]f the expert fails specifically to set forth the factual basis for his [or her] conclusion, the [board] must disregard his [or her] testimony."Ferland Corp. v. Bouchard, 626 A.2d 210, 214 (R.I. 1993). Additionally, although "uncontradicted testimony may not be rejected arbitrarily . . . [it] may be rejected if it contains inherent improbabilities or contradictions that alone or in connection with other circumstances tend to contradict it."Lombardo v. Atkinson-Kiewit,746 A.2d 679, 688 (2000) (internal citations and quotations omitted).
Before turning to the Appellant's allegation of error, the Court must note that though the Appellant applied for dimensional variances, its building is a prior, existing, legal nonconforming four-unit structure. Under the Ordinance, "[a] building or structure containing more dwelling units than are permitted by the use regulations of this ordinance shall be nonconforming by use." Sec. 200.4. Accordingly, because multi-family homes are prohibited in the R-1 district, in which the Appellant's property is located, the Appellant's property is nonconforming by use.
The established policy of the City of Providence declares:
 Nonconforming uses are incompatible with and detrimental to permitted uses in the zoning districts in which they are located. Nonconforming uses cause disruption of the comprehensive land use pattern of the city, inhibit present and future development of nearby properties, and confer upon their owners a position of unfair advantage. It is intended that existing nonconforming uses shall not justify further departures from this ordinance for themselves, or for any other properties. Sec. 201. *Page 20 
Further, the City recognizes that nonconforming uses in residential neighborhoods are especially problematic: "Due to the disruption which nonconforming uses cause to the peace and tranquility of a residential zone" it is the City's enacted policy that "[n]onconforming uses in residential zones are to be treated in a stricter fashion than nonconforming uses located in nonresidential zones" and that such uses "should be eventually abolished or reduced to total conformity over time." Sec. 201.1.
Though state law permits municipalities the option to allow alteration of nonconforming uses,see § 45-24-40, [7] in accordance with its policy disfavoring nonconforming development, Providence has elected to prohibit, generally, the intensification of nonconforming uses. Section 201.7 provides in pertinent part:
 [a] nonconforming use of a building, structure or land shall not be intensified in any manner. Intensification shall include, but not be limited to, increasing hours of operation, increasing the number of dwelling units, increasing the number of parking spaces, or increasing the seating capacity of a place of assembly. (Emphasis added.)
Where a party seeks to expand or intensify a nonconforming use, in the face of a flat prohibition in the local ordinance, the party seeking the relief must satisfy the more stringent requirements for the issuance of a use variance. See Lischio,818 A.2d at 692 ("It is important to *Page 21 
note the distinction set forth in § 45-24-41 between the evidentiary showing necessary for a use variance and the lesser threshold for a dimensional variance: § 45-24-41(d)(1) applies to a use variance and requires a showing of a loss of all beneficial use and § 45-24-41(d)(2) applies to a dimensional variance and requires a showing of hardship amounting to more than a mere inconvenience.").
As a general matter, a zoning board's failure to apply the correct legal standard to the relief sought constitutes error of law sufficiently prejudicial to an applicant's rights so as to warrant reversal and remand. See HugasCorp. v. Veader, 456 A.2d 765, 770 (R.I. 1983) ("trial justice erred in upholding the zoning board's utilization of the variance standard and in not remanding the case for reconsideration under the special-exception standard"). However, where a court is convinced that the decision of an agency or zoning board is ultimately correct, though based on the wrong reasoning at the agency level, the Superior Court may uphold the decision of the agency or board.See Mesolella v. City of Providence,439 A.2d 1370, 1373 (R.I. 1982); E. Turgeon Const. Co. v.Elhatton Plumbing Heating Co.,110 R.I. 303, 306, 292 A.2d 230, 233 (1972) (denying appeal despite the fact that the trial justice's "reasoning was wrong");Lancia v. Grossman's of R. I., Inc.,100 R.I. 407, 411, 216 A.2d 517, 520 (1966) (noting that the "trial justice reached the correct result, but for the wrong reason . . . [such] decision, however, does not thereby become erroneous").
The Applicant in this case sought both dimensional variances, as well as a use variance in order to intensify the nonconforming use. The Board appears to have considered all of the requested variances in the application only under the less stringent "more than a mere inconvenience" standard applicable to dimensional variances. It did not address the more stringent loss of "any beneficial use standard" with respect to the request for the use variance in *Page 22 
order to intensify the nonconforming use. However, in its decision, the Board specifically found that the Appellant "did not present any testimony that said prospective hardship that will be suffered by the Applicant if the relief requested is not granted shall amount to more than a mere inconvenience." Id. at 4. Given that the Board found that the Appellant failed to present evidence that would satisfy its burden in establishing that any alleged hardship amounted to the lesser standard of more than a mere inconvenience,a fortiori the Appellant failed to present sufficient evidence that the alleged hardship constituted a loss of any beneficial use of the property.[8]
Furthermore, the error, if any, of applying the incorrect standard with respect to the application for the use variance was harmless. Assuming arguendo that the hardship amounting to "more than a mere inconvenience standard" was the appropriate one with which to assess the application for the use variance, the Court still would conclude, based on the record before it, that the Board's decision was not affected by error of law, that the Zoning Board did not act in excess of its statutory authority or in violation of Ordinance provisions, and that the Zoning Board's decision was not unsupported by substantial evidence such that it is clearly erroneous, arbitrary and capricious, or an abuse of discretion resulting in substantial prejudice to the rights of the Appellant. *Page 23 
At the outset, the Court observes that it is undisputed that Appellant did not create its own hardship. The townhouse was built in 1854 and has never possessed on-site parking. Therefore, that is not an issue before the Court. The real question is whether there exists a hardship amounting to more than a mere inconvenience. At the hearing, the Applicant's expert, Mr. Sloan, testified that the Applicant would suffer a hardship amounting to more than a mere inconvenience if the relief were not granted because "there are very few properties that have absolutely no parking, and these would continue to be in that classification now that they no longer have the option of leasing space in the immediate vicinity." (Tr. 76.) No documents or evidence were submitted in support of this statement.[9]
However, juxtaposed against Mr. Sloan's expert testimony is the evidence in the record that parking was available for lease at nearby Brown. The record further reveals that the Appellant, in fact, did lease such parking and had done so, without interruption, for many years. Although the lease purportedly permits Brown to cancel the lease upon one year's notice, there was no evidence that Brown ever gave such notice, and no evidence to suggest that Brown intended to discontinue the leasing arrangement. The Board observed that Appellant failed to explore potential alternatives except to seek dedicated parking from the City.[10]
Furthermore, it presented no evidence that it had examined the option of leasing from landlords other than Brown. *Page 24 
The Board found that the Applicant did not show that the alleged hardship was "not due to the general characteristics of the neighborhood especially given the age and development history of Benefit Street. . . ." (Tr. 3.) Additionally, the fact that the property has been consistently and successfully used as a residence since its construction in 1854 further supports the Board's conclusion that the Applicant failed to prove the existence of a hardship amounting to more than a mere inconvenience.[11]
It is undisputed that there exist other residential properties in the area that do not have parking. Consequently, the inconvenience, if any, that Appellant may suffer is not due to the unique characteristics of the property; rather, it is due to the general characteristics of the surrounding area. Accordingly, Appellant failed to satisfy its burden under the Ordinance.See § 902.3(A)(1) (requiring an applicant to produce satisfactory evidence to demonstrate "[t]hat the hardship from which the applicant seeks relief is due to the unique characteristics of the subject land or structure and not to the general characteristics of the surrounding area; and is not due to a physical or economic disability of the applicant").
Given that (1) the Board "was uncomfortable" with the lack of documentary evidence concerning the leasing arrangements and with Appellant's "unwillingness to continue the matter so that Brown could have a representative present;" (2) the fact that Appellant continues to lease parking from Brown; and (3) the Board's finding that Appellant failed to clearly show that the alleged hardship was due to the unique characteristics of the property rather than the general characteristics of the neighborhood given the age and development of Benefit Street, the Court concludes that the Board's determination that Appellant failed to assert a hardship sufficient to constitute more than a mere inconvenience was not clearly erroneous. Furthermore, although *Page 25 
Appellant asserts that the Board rejected uncontroverted expert evidence, there is no evidence that, in fact, it did reject the testimony; rather, the Board's decision indicates that it believed the application to be premature because Appellant still enjoys uninterrupted parking from Brown.
The Court now will address the issue of whether any hardship was primarily the result of Appellant's desire for greater financial gain under § 902.3(A)(2). The Appellant contends that it satisfied this requirement because the record is devoid of any evidence that it, or any previous owners, altered the lot to eliminate parking spaces; rather, it points to Mr. Sloan's testimony that the hardship was the result of a lack of adequate parking on the site, and that the impetus for seeking the variance was to bring the nonconforming parking situation into compliance with the zoning ordinance and not to realize greater financial gain. In response, the Board points out that both the Applicant's attorney and expert witness conceded that the units would be worth much more with the parking than without it.
Although Mr. Sloan's testimony concerning financial gain was not challenged by contrary expert testimony, the Board was not persuaded by his opinion on this issue. When asked whether the requested relief was based primarily on a desire of the Applicant to realize greater financial gain or on the necessity to provide parking, Mr. Sloan simply responded "I believe it is a necessity. As far as the issue of financial gain, this is basically just trying to use the little feasible amount of space that could be used for parking in the best manner possible." (Tr. 74.) From this testimony, the Board reasonably could have inferred that the one of Appellant's motives for the requested relief was economic.
The Court finds that it is reasonable to conclude that on-site parking adds value to the property; however, the Court does not believe that the testimony at the hearing, standing alone, would be sufficient to make a finding that the primary motive for seeking the relief was for *Page 26 
financial gain. There is little question that a complete absence of parking in today's world would be inconvenient. In certain situations it may amount to more than a mere inconvenience. Accordingly, in the event that there had been a complete absence of parking in this particular case, the Court might conclude that it was more than a mere inconvenience.
However, there is no evidence that this Appellant has no parking whatsoever. In fact, the record reveals the opposite. The evidence demonstrates that Appellant has enjoyed, and continues to enjoy, the use of parking spaces leased from Brown. Although it contends that this arrangement is subject to termination upon one year's notice, no documentary evidence was produced to support this assertion. Furthermore, there was no evidence that any such notice ever has been given. When offered the opportunity to continue the hearing so that a representative from Brown could clarify the leasing arrangements, Appellant declined said opportunity. Accordingly, considering that Appellant currently possesses access to parking, coupled with the lack of sufficient evidence to show that Appellant sought alternative parking arrangements, the Court concludes that the Board did not err in finding that the application was premature and that Appellant failed to show a hardship amounting to more than a mere inconvenience.[12] *Page 27 
This Court concludes that the Board did not err in denying Appellant's request for the variances. Considering that at all times relevant, Appellant has had access to parking, the Court further concludes that the Board did not err in finding that Appellant failed to carry its burden of proving that there existed a hardship in the first instance, much less one that amounted to more than a mere inconvenience. Furthermore, in light of the fact that parking is a neighborhood problem, it was not erroneous for the Board to conclude that the hardship, if any, was not unique to Appellant's property but, rather, was attributable to the general characteristics of the surrounding neighborhood. Consequently, the Board's decision was not clearly erroneous in light of the substantial evidence of the record as a whole.
 IV Conclusion
For the above reasons, the Court concludes that the decision of the Board, dated February 26, 2007, was not made in violation of constitutional, statutory and ordinance provisions, was not clearly erroneous in view of the reliable, probative and substantial evidence of the whole record, and was not arbitrary or capricious or characterized by an abuse of discretion. Substantial rights of the Applicant have not been prejudiced. Accordingly, this Court affirms the decision of the Board.
Counsel shall submit an appropriate order in accordance with this Court's decision.
[1] Appellant initially failed to comply with the notice provision of G.L. 1956 § 45-24-69.1. However, notice was given out of time, and all parties seeking to intervene in this appeal were permitted to do so by consent of the parties. Accordingly, because failure to issue the required notice in a timely manner, if remedied, is not jurisdictional in nature, this Court has jurisdiction to hear this appeal. See Jeff Anthony Properties v. Zoning Board ofReview of North Providence, 853 A.2d 1226, 1232 (R.I. 2004).
[2] The Chairman of the Board described the hearing as follows: "The next matter before us is [Attorney] Teitz, 257 Benefit and then we are going to take testimony at the same time for 259 Benefit and 261 Benefit." (Hearing Transcript (Tr.), dated November 28, 2006, at 38.) In its decisions, the Board observed
 "the Applicant and the owners of 259 and 261 Benefit Street jointly requested that all three matters be heard simultaneously, and the Board agreed while also stipulating that any evidence introduced at this hearing and at the subsequent hearings for 259 and 261 Benefit Street was to be incorporated into the record for each of these matters. . . ." (Resolution No. 9171, dated February 23, 2007, at 1.)
Presently before the Court are the separate appeals from the Board's decisions relating to 257 and 259 Benefit Street. Although an appeal was filed on behalf of 261 Athenaeum Row, that appeal apparently never was pursued and is not before the Court.
[3] Number 261 Athenaeum Row is owned by Frank Scotti Charles Wheaton, Benefit Partnership, LLC. The partnership had plans to restore and condominiumize the property into three condominium units. Although Mr. Scotti's testimony is part of the instant record, many of his representations related only to 261 Athenaeum Row and do not influence the instant matter.
[4] Although Mr. Sloan was not formally qualified as an expert witness, his qualifications were entered, without objection, as an exhibit and he previously had been accepted by the Board as an expert. See City of Providence v. Estate of Tarro,973 A.2d 597, 601 n. 5 (R.I. 2009) (observing that although not formally qualified as an expert witness, the witness was admitted as an expert, without objection, after testifying "extensively regarding his experience and education . . .").
[5] Mr. Scotti later admitted that in addition to attempting to lease spaces from Brown for 261 Athenaeum Row, a property that is not before the Court, he also attempted to purchase spaces for that property. (Tr. at 114.)
[6] Section 902.3(B)(2) has been superseded by § 45-24-41(d)(2), as amended by P.L. 2002, ch. 384, § 1. It provides:
 The zoning board of review shall, in addition to the above standards, require that evidence is entered into the record of the proceedings showing that: . . . (2) in granting a dimensional variance, that the hardship suffered by the owner of the subject property if the dimensional variance is not granted amounts to more than a mere inconvenience. The fact that a use may be more profitable or that a structure may be more valuable after the relief is granted is not grounds for relief. The zoning board of review has the power to grant dimensional variances where the use is permitted by special use permit if provided for in the special use permit sections of the zoning ordinance. Section 45-24-41(d)(2).
See also Lischio v. Zoning Board of North Kingstown,818 A.2d 685, 691 (R.I. 2003) ("The new language in the 2002 amendment reinstates the judicially created Viti Doctrine . . . which held that for an applicant to obtain a dimensional variance (also known as a deviation), the landowner needed to show only an adverse impact that amounted to more than a mere inconvenience."). Consequently, even though Section 902.3(B)(2) states that an applicant is required to show that "there is no other reasonable alternative to enjoy a legally permitted beneficial use of one's property[,]" such requirement no longer is in effect.
[7] Section 45-24-40 provides:
 (a) A zoning ordinance may permit a nonconforming development to be altered under either of the following conditions:
 (1) The ordinance may establish a special-use permit, authorizing the alteration, which must be approved by the zoning board of review following the procedure established in this chapter and in the zoning ordinance; or
 (2) The ordinance may allow the addition and enlargment, expansion, intensification, or change in use, of nonconforming development either by permit or by right and may distinguish between the foregoing actions by zoning districts.
 (b) The ordinance may require that the alteration more closely adheres to the intent and purposes of the zoning ordinance.
 (c) A use established by variance or special use permit shall not acquire the rights of this section.
[8] The Court is of the opinion that Appellant also would have failed the loss of "any beneficial use" test, had it been applied. Mr. Sloan testified, "there are very few properties that have absolutely no parking, and these would continue to be in that classification now that they no longer have the option of leasing space in the immediate vicinity." (Tr. 76.) However, he also testified that the absence of parking on Providence's East Side was "very common" and that it wasn't unusual to find properties in this particular area with little or no parking. (Tr. 72.) Indeed, the record reveals that the property had been consistently and successfully used as a residence since its construction in 1854, i.e., well over one-hundred and fifty years.
Although it may be inconvenient for those seeking to own automobiles not to have parking, no evidence suggests that there would be a loss of any beneficial use should the variance be denied. Indeed, after expressing concern about this case, the Chairman observed: "I have friends who live over on the East Side, and they don't have parking, and they bought their house without parking and have to go out and find spaces, and they're four blocks away, and they walk to it, and they hate it when it rains and everything else." (Tr. 122.) It is clear to the Court that there are people who live on the East Side who have parking issues. It appears that these people are enjoying beneficial use of their properties, even if parking is a problem. Consequently, the Court is convinced that Appellant would not be able to satisfy the loss of any beneficial use standard based on the record evidence presented.
[9] Although Counsel for the Applicant made numerous representations concerning the hardship, it is axiomatic that "[s]tatements made by the applicant's counsel before the board that enforcement of the ordinance provisions would result in unnecessary hardship are mere conclusions and cannot, standing alone, justify a finding of unnecessary hardship."Migliaccio v. Zoning Bd. of Review of City of Providence,99 R.I. 101, 104, 205 A.2d 841, 842-43 (1964) (citingPettine v. Zoning Board of Review,96 R.I. 404, 411, 192 A.2d 433, 437 (1963)). Consequently, such statements have little or no probative force. SeePettine, 96 R.I. at 411, 192 A.2d at 437.
[10] The Court observes that although it was Mr. Scotti who unsuccessfully sought dedicated parking from the City for 261 Athenaeum Row, there is no reason to suggest that the Applicant in this case would have succeeded where Mr. Scotti failed.
[11] Such a conclusion necessarily would preclude a finding of deprivation of any beneficial use under the heightened standard for a use variance. See § 45-24-41(d)(1) (mandating an applicant to demonstrate that the property "cannot yield any beneficial use if it is required to conform to the provisions of the zoning ordinance").
[12] Although there was testimony from Mr. Scotti, a property developer, that his property at number 161 Athenaeum Row does not have any parking whatsoever, that particular property is not the subject of this appeal. Even if Number 261 Athenaeum Row were the subject of this appeal, the lack of documentary evidence concerning Mr. Scotti's alleged hardship would make it difficult for the Court to determine whether such alleged hardship is more than a mere inconvenience. Furthermore, assuming that it were more than a mere inconvenience, there would be insufficient documentary or expert evidence for the Court to determine whether his substantial rights were prejudiced.
Moreover, Mr. Scotti's statements about the lack of parking being a hardship such that he would not be able to sell the condominiums suggests his real motive for purchasing the property in the first instance, namely, financial gain. Mr. Scotti admitted that the units in his property would be much more valuable with parking than without it. He also testified that "[a]t this point we are kind of in limbo without the parking, and it's costing us about $10,000 bucks a month. Without the parking I don't think we can sell the units without it." (Tr. at 121.) While there is no evidence that Mr. Scotti created the alleged hardship, his development company purchased the property with the full knowledge that it did not contain on-site parking. Thus, from the record, it appears that Mr. Scotti's primary motive for seeking the requested variances impermissibly may have been for financial gain.See § 902.3(A)(2) (requiring satisfactory evidence that "[t]hat the hardship is not the result of any prior action of the applicant and does not result primarily from the desire of the applicant to realize greater financial gain").